UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JORDAN LEVI ELDER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:23-cv-37-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | |
| PULASKI COUNTY, | ) | OPINION & ORDER |
| KENTUCKY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Jordan Elder, serving a parole revocation term, experienced a lingering toothache while incarcerated at Pulaski County Detention Center (PCDC). Following nearly 10 months of treatment by prison medical staff and a third-party contracted dentist, Elder was released from PCDC and pursued private medical treatment for the pain. After further examination and testing, doctors diagnosed Elder with jaw cancer, which required extensive surgery to eradicate. Elder then filed this § 1983 claim against Pulaski County, Kentucky and PCDC nurse Kacey Coffey,[1] alleging that each exhibited deliberate indifference to his medical needs in violation of the Eighth Amendment's Cruel and Unusual Punishments Clause. They did not, under applicable standards on this scant record, so the Court **GRANTS** summary judgment to Defendants on both claims.

---

[1] Elder's complaint wrongly identifies Ms. Coffey as Cassie, rather than Kacey. *See* DE 36-1 at 1. The Court uses the correct spelling of her name for purposes of this Order, despite the case caption showing otherwise.

# I.    Background

### a.    Factual Background[2]

Following a parole violation, *see* DE 37-4, Jordan Elder was detained as an inmate at Pulaski County Detention Center in Pulaski County, Kentucky. While awaiting acceptance of his adjudicated sanctions, *see* DE 37-5, Elder first complained of a toothache in late 2021. On December 26, 2021—the first visit with PCDC's medical team—prison medical staff, finding only cavities and no signs of serious infection, offered Elder 800mg of Ibuprofen and sent him on his way. *See* DE 37-6 at 1–2. Elder next encountered prison staff, after a second complaint of discomfort, on January 10, 2022. *See* DE 36-7 at 1–2. Here too, Elder showed no signs of infection, drainage, or abscess, though the gums surrounding the tooth were pink and scabbed, purportedly due to Elder's picking at the irritated area. *See id.* Jail medical staff instructed Elder to avoid any picking, administered a 1,000mg dose of Tylenol, and offered an antibiotic pack to address the area if he noticed any drainage. *See id.*

This cycle continued apace. Elder's adjudication and parole-based imprisonment term ripened in February of 2022. *See* DE 36-4. Elder's pain persisted over the next several months, so on April 4, 2022, prison staff placed him on the prison's dental list for assessment by a dentist. *See* DE 37-7. In the meantime, PCDC medical staff routinely evaluated and assessed the troubled area, seeing Elder five time in April, 2022, *see* DE 37-7; 37-8 at 1–4, and five times again in May, 2022. *See* DE 36-9 at 3; DE 37-8 at 5–7; DE 37-9. None of these assessments revealed any signs of infection, abscess, or drainage, so prison staff administered a variety of palliative treatments

---

[2] Defendants filed their briefs with many attachments.  Some, an affidavit supports; others appear without authentication.  That said, Plaintiff has had a full chance to respond to the briefs and, except for a conclusory and unsworn one page filing, has not responded.  The Court processes the record as presented, treating as authentic the records Defendants attached, which drew no authenticity objection.

ranging from Tylenol, Ibuprofen, oral gel, hygiene instructions, to salt rinses for the affected area. *See* DE 36-9 at 3; DE 37-8 at 5–7; DE 37-9.

This span of treatment involved Edler's singular interaction with Defendant Coffey. On May 1, Coffey assessed Elder for complaints of "a sore on his figure" [sic], for which he requested "something for it and a bandaid." *See* DE 36-9 at 3. Elder submitted the assessment request on the evening of May 1, and Coffey assessed him later that evening. *See id.* (request submitted at 19:23 and progress notes completed at 11:28 p.m.). Coffey's treatment notes from the visit confirm that Elder's complaint referred to "a small scratch" on Elder's ring finger. *See id.* Seeing no signs of infection on the finger, she offered Elder "TAO and [a] bandaid." *Id.* While Elder's assessment request did not specifically address the long-ailing tooth, Coffey's treatment notes suggest that Elder raised the toothache again during the assessment. The notes state that, alongside the TAO and bandaid, Coffey also offered Elder an "oral pain relief pack" during the assessment. *Id.* Neither Elder's initial assessment request, nor Coffey's assessment notes, make any further mention of the toothache. In Elder's nearly ten-months of treatment, this single visit makes up the full extent of Elder and Coffey's interactions.

The next pertinent event in Elder's treatment occurred on May 25, 2022, when he was formally evaluated by a dentist for his chronic toothache. *See* DE 36-10. Upon examination and x-ray, a dentist from Mid America Health, Inc.—a third-party contracted company which provides dental services to inmates[3]—concluded that Elder had "very good bone support," in the affected area and that the two teeth primarily at issue should be "restored as opposed to extracted." *See id.* at 1. He further stated, however, that if extraction ultimately became necessary, that Elder would need to consult an oral surgeon to have the procedure completed. *See id.* That Elder was on Plavix

---

[3] *See* Mid America Health, *About Mid America Health*, https://www.mahweb.com/about-mah/, (last visited Nov. 1, 2024).

(a blood thinner) at the time, also appears to have played some role in the recommendation, though the dentist's report does not clearly explain the exact effect. *See id.* ("pt also on Plavix [and] told that if[/]when released he has extractions most likely an [oral surgeon] will be needed"). As part of the visit, Elder signed an informed consent form authorizing a "Dr. Mayo" to examine his teeth in anticipation of an extraction surgery. *See id.* at 3. However, nothing in the record indicates that the examination ever took place during Elder's incarceration. The note indicates that the dentist secured a PA (likely an x-ray) as part of the examination. *See id.*

Elder's complaints of toothaches persisted after the visit. PCDC nurses assessed Elder five times during June 2022. During these visits, nurses noted a potential abscess indicated by the presence of blood and a small pus-filled blister on the gum area. *See* DE 36-12 at 3–5. Later reports from June also note for the first time that one of Elder's teeth had chipped. *See id.* at 1–2. The progress notes indicate that PCDC nurses considered the symptoms to be the result of an infection. *See id.* They prescribed a 6-day regiment of Clindamycin to treat the suspected infection, and at each visit, also administered pain management treatments including Ibuprofen, Tylenol, and Orajel packets. *See id.* at 1–5. June's final report, following Elder's 6-day antibiotic treatment, noted the presence of a tooth chip and cavities on the tooth, but did not report any bleeding, abscess, or pus. *See id.* at 1. July's two assessments showed little change. Elder complained of tooth pain, and nurses promptly assessed the affected area. *See* DE 37-2. During July's first assessment, the examining nurse noted redness and mild irritation of the surrounding gums, but no further signs of abscess following the June antibiotic treatment. *See id.* at 1. The nurse also noted that the gums appeared impacted and that a lack of brushing left food particles in the area. *See id.* Elder received another dose of Tylenol. *Id.* At July's final visit, the nurse placed Elder again on the dentist list,

but this time for the express purpose of having the tooth pulled. *See id.* at 2. The nurse also administered another Tylenol dose. *Id.*

August and September featured more of the same. PCDC medical staff assessed Elder for tooth pain on three occasions. *See* DE 37-12. He received two antibiotic packs, two rounds of Orajel, a dose of Tylenol, and a seven-day dose of Ibuprofen. *See id.* Nurses noted the presence of tooth decay and swollen and red gums, but did not report any abscess, bleeding, or pus. *See id.* at 1–3. Elder's conditions appeared to worsen again in September. He was seen seven times by PCDC staff complaining of the same toothache, while adding headaches and earaches to the list. *See* DE 37-13. The assessments consistently indicated tooth decay, gum swollenness and redness, and small amounts of blood emanating from the troubled area. *See id.* at 1–5. Nurses provided familiar treatments like Tylenol, antibiotic packs, saltwater rinses, and ice compresses. *See id.* The final two reports on September 21 and 26 reported an abscess, with the September 21 report noting that Elder remained on the dental list for further treatment. *See id.* at 6–7.

October, 2022 marked Elder's final month incarcerated in PCDC. His final month, much like the months prior, included several visits to the PCDC medical staff. Like before, Elder complained of a toothache, bleeding, and an abscess on his gums. *See* DE 37-14. Three examinations found no bleeding and no signs of abscess, *see id.* at 3–5, while another reported swelling and bleeding, which warranted another round of antibiotics. *See id.* at 2. In his final visit with PCDC on October 24, 2020, Elder's tooth, despite complaints, showed no signs of abscess after the recent antibiotic treatment, no mentioned bleeding, and only "minor irritation," seemingly due (again) to Elder's picking habit. *See id.* at 5. The nurse prescribed a round of Tylenol, *see id.*, and Elder was released from PCDC six days later on October 30, 2022. *See* DE 36-19. While Elder

remained on the dental list for further evaluation, and possibly extraction, *see* DE 37-13 at 6–7, he did not see a dentist a second time while under PCDC's supervision.

After Elder's release, he allegedly visited the White House Medical Clinic in Mount Vernon, Kentucky. The clinic referred him to an oral surgeon at the University of Kentucky Medical Center, which ordered a biopsy of the gum surrounding the aching tooth. That biopsy later evidently revealed squamous cell carcinoma, a rare form of head and neck cancer that often begins in the jawbone. *See* DE 36-21 at 2; Cleveland Clinic, *Jaw Cancer*, https://my.clevelandclinic.org/health/diseases/jaw-cancer, (last modified May 13, 2024). Following his diagnosis, Elder underwent surgery to treat the cancer, which required removing all his teeth, reconstructing portions of his jawbone using a bone graft from his fibula, and repurposing skin from his leg to replace damaged skin on the gums and cheeks. *See* DE 1-2 at 3–4. Elder reports that he still experiences challenges from the surgery today. His medical records demonstrate difficulties eating, chewing, swallowing, and speaking. *See* DE 1-3 at 29–31. He routinely visited a speech pathologist to improve his speech quality in the months after the surgery, and for an extended period, received much of his nourishment via a feeding tube. *See id.* at 32–36.

### b. Procedural Background

Following his surgery, Elder filed this action under 28 U.S.C. § 1983, alleging that Pulaski County Detention Center, Kacey Coffey, and Captain Raman Bates violated his Eighth Amendment rights. *See* DE 1-2 at 1. For damages, he sought $500,000 and that his charges be "expunged or dropped." *See id.* at 4. Elder later amended his complaint, adding, among other things, that PCDC staff would "do nothing about [his] mouth" because it was "just an [abscessed] tooth" and "he was on blood thinners." *See* DE 7 at 4 (cleaned up).

Given Elder's *pauper* status, the Court conducted an initial screening under 28 U.S.C. § 1915(e)(2)(B)(ii). *See* DE 8. Concluding that Elder failed to state a plausible claim for relief against Captain Raman Bates and that Pulaski County Detention Center was not an entity capable of being sued, the Court dismissed without prejudice Elder's claim against Captain Bates and substituted Pulaski County, Kentucky in place of PCDC. *See id.* Leaving Elder's claims against Pulaski County and Kacey Coffey viable for the moment, the parties proceeded to discovery after both defendants answered denying the substantive allegations against them. *See* DE 11; 16. Discovery proved bumpy. Elder routinely struggled to comply with his discovery obligations, missing discovery calls, failing to timely respond to interrogatories and requests for admission, and leaving defendants wanting for information regarding expert testimony. *See* DE 30 (Show Cause Order for Elder's failure to attend mid-discovery conference call); DE 36-1 (noting that Elder never served Rule 26(a)(1) disclosures, never answered interrogatories, and never identified an expert). Nonetheless, discovery ended, and on Magistrate Judge Ingram's order to proceed as the defendants "[saw] fit," *see* DE 31, each separately moved for summary judgment with what discoverable information they possessed. *See* DE 36; 37. Elder responded, albeit in a one-and-a-half-page document, identifying two "lies" in the summary judgment briefing and affirming his interest in pursuing his lawsuit. *See* DE 41.[4] The defendants each responded. *See* DE 42; 43. The motions are now ripe for review.

## II.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[4] The Court had warned him of the duty to "timely respond on the merits and in accordance with the applicable rules." DE 39. Failure to do that could "result in the Court accepting Defendants' version of the facts . . . and granting Defendants' requested relief." *Id.* Elder has not in any way pointed to, offered, provided, or placed before the Court evidence—"specific facts"—justifying a trial, per the Rule 56 rubric.

matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the court may not "weigh evidence [or] determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *See id.* However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Then, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission—but not necessarily admissible—into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

### III.  Deliberate Indifference Standard

The Eighth Amendment to the United States Constitution prohibits, among other things, the government's infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Aside

8

from restraining the government's methods and severity of punishment, the Clause also imposes affirmative duties on prison officials to provide humane confinement conditions, entailing adequate food, clothing, shelter, and medical care. *See Farmer v. Brennan*, 114 S. Ct. 1970, 1976 (1994) (citing *Hudson v. Palmer*, 104 S. Ct. 3194, 3200 (1984)). Where prison officials fall short, a constitutional violation may result.[5]

The Eighth Amendment's text does not address how severe such a failure must be to constitute "cruel and unusual" punishment; so, the Supreme Court has filled the gaps. Its cases have long held that a prison official must have a "sufficiently culpable state of mind" that rises to the level of "deliberate indifference to inmate health or safety" to violate the Eighth Amendment. *Farmer*, 114 S. Ct. at 1977 (citing *Wilson v. Seiter*, 111 S. Ct. 2321, 2326 (1991)). First coined in *Estelle v. Gamble*, 97 S. Ct. 285, 291 (1976), deliberate indifference for an inmate's medical needs requires something more than "negligence in diagnosing or treating a medical condition." *Id.* at 292. Instead, it describes a subjective state of mind evincing "obduracy and wantonness" to an inmate's serious medical needs rather than "inadvertence or error in good faith." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Wilson*, 501 U.S. at 299). With some give and take, deliberate indifference falls generally between the poles of negligence and purposeful or knowing harm. *See Farmer*, 114 S. Ct. at 1978. The Courts of Appeals, so says the Supreme Court, have coalesced around something akin to criminal recklessness: the conscious disregard of a substantial

---

[5] The Court applies the standard applicable to an incarcerated person. Different rules apply when a pretrial detainee makes a claim, but a person held in service of a parole revocation term—which is part of the original sentence—is subject to the Eighth Amendment standard. *See Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021) (adopting a modified subjective prong for deliberate indifference claims brought by pretrial detainees under the Fourteenth Amendment); *see also Bond v. Moore*, 672 F. Supp. 3d 357, 367–68 (E.D. Ky. 2023) (applying the modified standard to a claim of deliberate indifference to medical needs brought by pretrial detainee).

and unjustifiable risk of harm. *See Farmer*, 114 S. Ct. at 1979–80 (collecting cases and applying the criminal recklessness standard to deliberate indifference claims).

Deliberate indifference claims concerning an inmate's medical needs turn on an objective and subjective component. *See Rhinehart*, 894 F.3d at 737. The inmate must show that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable state of mind, rising above gross negligence. *See id.* (citing *Farmer*, 114 S. Ct. at 1970).

As for the objective component, the inmate must show a sufficiently serious deprivation of medical care to constitute cruel and unusual punishment. *Farmer*, 114 S. Ct. at 1977 (noting that a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities"). The bar can be met by prison's staff's complete omission or by demonstrating the inadequacy of its commission. *See Rhinehart*, 894 F.3d at 737; *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) ("[W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."). For example, when a physician diagnosed an inmate with a medical need mandating treatment, and the prison failed outright to provide such treatment, the inmate may establish deliberate indifference by pointing to the lack of medical attention paid to the serious medical need. *See Rhinehart*, 894 F.3d at 737; *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). But showing deliberate indifference during the treatment stage is more stringent. *See Rhinehart*, 894 F.3d at 737. In a setting where the inmate has received on-going treatment, but claims that the treatment was inadequate, an objective showing of deliberate indifference requires care "so grossly incompetent, inadequate, or excessive as to the shock the

10

conscience or to be intolerable to fundamental fairness." *Id.* (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

The latter species of deliberate indifference claim—an adequacy-of-care claim, as generally understood—normally requires special proof on the objective component. Because "a disagreement with a course of medical treatment" does not amount to deliberate indifference, *see Rhinehart*, 894 F.3d at 744, the inmate must provide "medical proof that the provided treatment was not adequate," which often demands expert medical testimony demonstrating "the medical necessity for the [withheld] treatment and the inadequacy of the treatments" the inmate received. *Id.* at 737–38 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)) (internal quotations omitted); *see also Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (squaring the medical-evidence requirement in an adequacy-of-care claim with the standard practice that a plaintiff in a medical malpractice tort claim must normally provide medical evidence to establish a triable claim against a physician or surgeon). Even short of expert testimony, an inmate must, at the very least, "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Rhinehart*, 894 F.3d at 738.

If an inmate demonstrates a triable issue of fact on the objective component, only then does the subjective component have a part to play. *See Phillips*, 14 F.4th at 535. The subjective component asks whether an official knew of and disregarded a serious medical need. *See id.* Accidental harms do not inflict "punishment" within the meaning of the Eighth Amendment. *See id.* (quoting *Wilson*, 111 S. Ct. at 2321). So, the relevant official must first know of the facts that show the serious medical need, personally conclude that the need exists, and finally, "consciously disregard" such need. *Phillips*, 14 F.4th at 535; *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th

11

Cir. 2010). On this record, and against the arguments presented, Elder fails to establish triable issues on each of the critical steps.

## IV. Analysis

### a. Nurse Kacey Coffey

The Court first turns to Elder's claim of deliberate indifference against Nurse Coffey. Section 1983 provides a federal cause of action against government officials who, while acting under color of state law, "deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). While Elder does not specifically allege that Coffey acted under "color of state law," Coffey does not dispute the point in her briefing. In any event, it's clear that a prison nurse, either employed by a prison or county or in contract with a prison, acts under color of state law when examining and treating inmates. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (contracted prison nurse acting under color of state law); *Castleberry v. Cuyahoga Cnty.*, No. 1:20 CV 218, 2020 WL 3259250, at *3 (N.D. Ohio June 16, 2020) (prison nurse employed by prison acting under color of state law). Thus, the only issue, for § 1983 purposes, is whether Coffey deprived Elder of his Eighth Amendment rights.[6]

Elder primarily argues that Coffey denied him medical attention when he reported swelling on his tooth and that he did not see a "real doctor or dentist" following his complaints. *See* DE 1-2 at 1. He also reports that Coffey "got mad at him" for his requests and stated that he should not compare his treatment to the treatment of other prisoners because their circumstances differed from

---

[6] The Eighth Amendment being incorporated against the states through the Fourteenth Amendment. *Tangilag*, 14 F.4th at 532.

his. *See id.* Finally, as to Coffey, Elder complains that the "nurse" and "[other staff] wouldn't do anything about [the tooth]" because Elder was on blood thinners at the time. *See* DE 7 at 4.[7]

Despite naming Coffey as one of two defendants in his lawsuit, Elder had very limited interaction with Coffey during his incarceration at PCDC. Coffey assessed Elder one time, on May 1, 2022. *See* DE 36-9 at 3; DE 36-23 at 1. Oddly, this visit does not appear to have primarily concerned Elder's tooth, as the treatment notes indicate that Elder sought assessment for a cut on his finger, rather than anything to do with his teeth or gums. *See id.* After assessing Elder's cut and seeing no signs of infection on the finger, Coffey offered "TAO and [a] bandaid." *Id.* This approach must have been effective at some level, as nothing indicates that Elder complained of the cut again. Elder's tooth must have come up at some point during the assessment, though, as Coffey's treatment notes also indicate that she offered Elder an "oral pain relief pack" from the assessment. *Id.* Nonetheless, this single-page treatment note comprises the full extent of the interaction between Elder and Coffey in the record.  She so avers.  *See* DE 36-23 at ¶ 10.

This extremely restricted contact falls well short on each component of the deliberate indifference standard. Starting with the first, nothing in the record indicates care so "grossly incompetent, inadequate, or excessive" as to shock the conscience. *Rhinehart*, 894 F.3d at 737. Coffey assessed Elder for a minor cut on his hand, for which she administered treatment. *See* DE 36-9 at 3. Likewise, as to Elder's toothache, Coffey treated Elder in much the same way as previous

---

[7] As a *pro se* litigant, Elder receives "liberal construction" of his filings, which sometimes calls for the Court's "active interpretation" to substantiate an allegation stating federal relief. *See Thomas v. Brennan*, No. 1:18 CV 1312, 2018 WL 3135939, at *1 (N.D. Ohio June 26, 2018) (citing *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985)). This leniency only goes so far, though. Liberal construction does not "abrogate basic pleading requirements" or require the Court to "conjure unpleaded facts or construct claims against defendants" on the *pro se* plaintiff's behalf. *See Anderson v. Kohberger*, No. 5:24 CV 1297, 2024 WL 4451254, at *1 (N.D. Ohio Oct. 9, 2024) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)). Thus, while the Court diligently searches for the building blocks of Elder's claims, it will not build the structure for him.

and subsequent nurses, offering medication to ease the pain in anticipation of Elder's visit with a dentist. *See* DE 37-8 at 1–7 (providing Elder with Ibuprofen, Tylenol, salt rinses, and antibiotics until Elder visited the dentist). Importantly, when Coffey assessed Elder, his tooth did not show some of the more serious signs of concern such as bleeding, abscess, and pus that eventually appeared in later assessments. *Compare* DE 37-8 at 1–7 (showing no signs of bleeding, infection, or abscess during April and May) *with* DE 37-13 at 1–7 (reporting minor bleeding, abscess, and irritation in the affected area during September). When Coffey assessed Elder, she offered him pain relief medication for an aching tooth, as ordered by her supervisors—nothing more, nothing less. *See* DE 36-23 at 2 ("[A]ny treatment I provided Mr. Elder for his dental pain was ordered by my supervisors."). Given the relatively minor appearance of the medical condition at the time, and the equivalent treatment for the minor need, nothing indicates that, even when viewing the facts in Elder's favor, Coffey's conduct was "grossly incompetent, inadequate, or excessive as to shock the conscience." *Rhinehart*, 894 F.3d at 737; *Jones v. Cnty. of Kent*, 601 F. Supp. 3d 221, 250 (W.D. Mich. 2022) (finding a dispute about adequacy of a single assessment more akin to a medical malpractice claim, not deliberate indifference). This is an area that requires medical expertise, and Elder points to no expert proof critical of Coffey's role and decisions.

Elder's claim that Coffey denied him treatment because he was on blood thinners at the time also lacks merit. When Coffey assessed Elder on May 1, Elder had chiefly requested that the tooth be pulled because of the pain and because some of his cell mates had teeth pulled without issue. *See* DE 36-9 at 9; DE 1-2 at 1. Importantly, PCDC staff placed him on the dental list to be seen by a dentist for the toothache after the third complaint to PCDC staff. *See* DE 36-9 at 9 (placing Elder on the dentist list). When Coffey assessed Elder on May 1, he was still awaiting that visit, and thus, Coffey had nothing to do other than manage the pain while Elder awaited his

appointment. Coffey, as a nurse, also lacked authority and capability to pull the tooth on the spot or to do more, in terms of medicine, than she did. *See* DE 36-23 at 1 ("As a LPN, it is outside the scope of my practice to diagnose medical and/or dental conditions…. I must follow my superiors' and physicians' orders concerning medication administration and patient care."). Only strained reasoning supports a conclusion that Coffey was deliberately indifferent to a need that she could not have even fulfilled herself. Moreover, there is no evidence in the record to suggest that Elder's blood-thinners played any role in Coffey's assessment on May 1. The first reference to Elder's blood thinners comes in the notes to Elder's meeting with the dentist on May 25, *see* DE 37-9 at 1, and even there, the dentist did not *deny* treatment because Elder was on Plavix. He only suggested that he consult an oral surgeon, who would ultimately have to complete the extraction upon his release. *See id.* There is no suggestion that Elder's use of Plavix caused him any delay or denial of treatment before Coffey or any other PCDC medical staff member. Thus, Elder's assertion that Coffey, let alone any other staff member, denied him treatment based on his blood thinners rings entirely hollow.

Further, even assuming Elder demonstrated a genuine dispute of material fact concerning the inadequacy of Coffey's care, which is not the case, he fails to meet the unique evidentiary demands that accompany adequacy-of-care claims. Such claims, like a medical malpractice tort claim, require expert testimony to demonstrate "the medical necessity for the treatment and the inadequacy of the care received." *See Rhinehart*, 894 F.3d at 737–38. And while a plaintiff asserting an adequacy-of-care theory may theoretically (in the clearest of cases) do so without presenting expert testimony, a plaintiff must at the very least provide "verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Id.* at 738. Elder falls short on both fronts. The only evidence Elder musters in this case is 58 pages of medical records

attached as an exhibit to his original complaint. *See* DE 1-3. All the records refer to Elder's treatment with Cardinal Hill Rehabilitation Center, though many of the records concern an unrelated 2016 rehabilitation effort not at issue here. *See* DE 1-3 at 11–15, 44–58. Regardless, none of the evidence in the bunch purports to be the type of expert testimony generally considered necessary to successfully bring an Eighth Amendment adequacy-of-care claim. Indeed, none details the course, etiology, diagnoses, or decisions of the providers. Nothing presents an expert foundation critical of jail care. But even setting that aside, the medical evidence Elder provides— while it does document an extensive recovery from a serious and undoubtedly gruesome surgery— does nothing to establish the detrimental effect of *Coffey's* care on Elder's medical circumstances. Unwarranted inference and heavy speculation could lead to a conclusion that a quicker diagnosis would have aided him in some way, but Elder offers nothing concrete to suggest that the surgery would not have been required at all, would have been less burdensome or intrusive, or any other species of evidence suggesting that his suffering from cancer would have been somehow abated but for Coffey's inadequate treatment on May 1. At the absolute least, an adequacy-of-care claim requires some form of evidence demonstrating that the complained of care was inadequate *and* that it had a detrimental effect on the plaintiff. *See Rhinehart*, 894 F.3d at 737–38; *Blackmore*, 390 F.3d at 898. As to Coffey, Elder has failed in that showing.[8]

---

[8] The Court recognizes the inherent challenges in proceeding *pro se*. Discovery rules, deadlines, and all the procedural fodder that comes with them can prove daunting to a trained lawyer, let alone a person managing the process without formal legal training. The Court further recognizes that Elder was incarcerated during some of the relevant discovery period, making it difficult to comply with discovery deadlines. *See* DE 41 (Response) at 2. Nonetheless, as the plaintiff, the claim is Elder's to manage, and whether proceeding *pro se* or not, the summary judgment standard does not yield. A pro se litigant receives liberal construction and some leeway in technical rigor, but the rules (like, the requirement to respond properly to a Rule 56 motion) apply to all. *See Allen v. Stark State Coll.*, No. 5:17CV02706, 2019 WL 3387772, at *9 (N.D. Ohio July 26, 2019) ("Even though plaintiff is proceeding *pro se*, he still must comply with the federal civil rules….").

While the first component to Elder's deliberate indifference claim against Coffey lacks a triable issue of fact, had the Court proceeded to the second component, the claim would fail there too. Under the subjective component, Elder must have shown that Coffey knew about a serious medical need, personally concluded that the need existed, and "consciously disregarded" the need. *See Phillips*, 14 F.4th at 535; *Winkler v. Madison Cnty.*, 893 F.3d 877, 892 (6th Cir. 2018). Like the first component, nothing on the record rises to this level of indifference. At the time Coffey treated Elder, he presented with only a toothache and a cut on his finger. The medical progress notes documenting that visit, along with those surrounding it, reported no bleeding, abscess, infection, or any other medical cue to indicate that something more than a mere toothache was at play. *See* DE 37-8 at 1–7; DE 36-9 at 3. It would, accordingly, be entirely unsupported to conclude that Coffey knew of Elder's serious medical need at the time, personally concluded that the need existed, then consciously disregarded that need. *See Phillips*, 14 F.4th at 535. Coffey had no way of knowing when she assessed Elder—short of complex and lengthy diagnostic procedures not available to her—that Elder suffered from any serious medical condition, let alone cancer. Instead, she treated a toothache, as it appeared to be, with OTC pain medication. The Eighth Amendment requires no more of her. *See Kosloski v. Dunlap*, 347 F. App'x 177, 180 (6th Cir. 2009) (finding that prison nurse who did not believe that plaintiff suffered from a serious ailment, even if the belief was negligent, did not demonstrate deliberate indifference under the subjective component).

To survive summary judgment for his claim against Coffey, Elder must demonstrate a genuine dispute of material fact that Coffey's treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Rhinehart*, 894 F.3d at 737, and that Coffey knew of Elders' serious medical need, personally concluded that it existed, then "consciously disregarded" the need, *see Phillips*, 14 F.4th at 535. The limited record

leaves neither prong in genuine dispute as to Coffey's conduct, so the Court must **GRANT** summary judgment in Coffey's favor.

### b. Pulaski County Detention Center

The Court now turns to Elder's final claim: a § 1983 claim against Pulaski County, Kentucky. Again, Coffey was the lone individual provider named.

As a municipal defendant, Elder must take a sharply different path to succeed against Pulaski County. While § 1983 traditionally addresses individual conduct, under certain circumstances a municipality, as an entity, may be liable for violating a plaintiff's constitutional or statutory rights. *See Monell v. Dep't of Soc. Servs. of City of New York*, 98 S. Ct. 2018, 2036–37 (1978). But restrictions apply. Section 1983 holds local governments responsible only for their own illegal conduct, not the vicarious actions of individual employees. *See D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)). Because the inquiry looks to the government as an entity, rather than scrutinizing individual acts, a plaintiff seeking to impose municipal liability under § 1983 must prove that "action pursuant to an official policy" caused their injury. *See Connick*, 131 S. Ct. at 1359. The Sixth Circuit considers an "official policy" to include decisions, acts, or practices "so persistent and widespread as to practically have the force of law." *See D'Ambrosio*, 747 F.3d at 386. That general standard has produced four categories, at least one of which a plaintiff asserting a municipal § 1983 action must plead and prove: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence to federal rights violations. *Id.* (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Elder's Complaint is silent, and his putative response (DE 41) sheds no light.

18

While Elder's complaint does not specifically rely on one of these four categories, his complaints against Pulaski County most closely resemble the final category: a custom or tolerance of acquiescence to federal rights violations. Elder asserts that "a lot of [his] civil rights were violated" during his incarceration, DE 1-2 at 4, that "[PCDC] has no real medical" care, DE 7-1 at 1, and that PCDC should be "shut down because of how they [treat] inmates." *Id.*

These bare assertions fall well short of creating a genuine dispute of material fact on *Monell*'s "official policy" requirement. Elder provides no evidence tending to show that, even if PCDC's staff was deliberately indifferent to his medical needs, the acquiescence was so "persistent and widespread" to amount to an official policy. All (such as it is) the documentation Elder provides the Court relates exclusively to his circumstances, not to Pulaski County's conduct on a broader scale. Indeed, the only time Elder references other inmates in PCDC, he appears to affirm that these inmates received the type and quality of care that would have rendered his care sufficient. *See* DE 1-2 at 1. Elder notes that one of his roommates and another inmate both had several teeth pulled while incarcerated, even while one utilized blood thinners. *See id.* Elder concludes, then, that his care was constitutionally inadequate because other inmates received the type of treatment that he felt entitled to. *See id.* But if it's true that other inmates received what Elder would have considered to be proper care, then it also follows that the alleged deliberate indifference exhibited in Elder's individual case was not so widespread as to constitute an "official policy" of acquiescence to constitutional violations.

But the Court can grant summary judgment for Pulaski County for an even more fundamental reason. "There can be no liability under *Monell* without an underlying constitutional violation." *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023). Thus, if there is no genuine dispute of material fact that *any* Pulaski County employee or contractor violated Elder's

Eighth Amendment rights, then Pulaski County could not have maintained a policy or custom supporting the violation of constitutional rights. *See id.* (dismissing *Monell* claim against city for failure to plausibly allege any constitutional violation). As previously noted, Elder identifies no genuine dispute of material fact concerning the constitutionality of Coffey's treatment on May 1. But even further, Elder fails to demonstrate a genuine dispute of material fact that any PCDC employee or contractor was deliberately indifferent to his medical needs. Elder's May 25 visit to a Mid America Health, Inc. dentist perhaps toes the line most closely. *See* DE 37-9. There, the dentist assessed and diagnosed Elder, suggested that Elder consult an oral surgeon once he was released, recommended reconstruction for the teeth as opposed to extraction, and contemplated that Elder's use of Plavix may be of some relevance to his future treatment. *See id.* at 1. Elder may conclude that this dentist should have seen the signs of a more serious illness and should have suggested more aggressive testing and treatment, both of which could have led to an earlier diagnosis, and possibly, a less debilitating surgery. But even drawing these highly favorable conclusions of something akin to negligence—none of which the record directly supports—does not get Elder where he needs to go. *See Rhinehart*, 894 F.3d at 738 ("A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation."). At the very most, the record demonstrates some level of carelessness or passivity to Elder's medical needs. Although such an approach gives "no cause for commendation," *Farmer*, 114 S. Ct. at 1979, it falls well short of the criminal recklessness standard that accompanies a deliberate indifference claim. *See id.* at 1980.

Elder fails to identify a sufficiently pervasive disregard for inmate medical needs to establish an "official policy" under *Monell*. And in any event, he fails outright to demonstrate a triable issue concerning whether *any* individual acting under color of state law exhibited deliberate indifference to his medical needs. Either theory, taken together or separately, justifies the Court's **GRANT** of summary judgment in Pulaski County's favor.

### c. Procedural Arguments

Coffey and Pulaski County dedicate various portions of their briefing to arguments concerning Elder's procedural habits, mostly surrounding discovery. *See* DE 37-1 at 10–12; DE 36-1 at 7–11. To be sure, Elder's discovery and procedural compliance was less than desirable, with this Court and Magistrate Judge Ingram often seeing it fit to step in and remedy a defect. *See, e.g.*, DE 8 (Order substituting proper party); DE 29 (Show Cause Order for failure to join mid-discovery status conference); DE 31 (Order directing defendants' counsel to proceed "as they see fit" considering Elder's failure to join two separate status conference calls); DE 39. The Court resolved this case on the merits, eliminating any need to tend the procedural arguments.

### V.    Conclusion

Elder suffered mightily from cancer—of that, the Court has no doubt. But Elder's suffering, without more, does not violate the Eighth Amendment. The Court must only decide whether the record presents a genuine dispute of material fact that either Kacey Coffey or Pulaski County showed deliberate indifference to Elder's serious medical needs. Because the record leaves no room for a reasonable fact finder to side with Elder, the Court **GRANTS** summary judgment in favor of Coffey and Pulaski County. A separate judgment will follow.

This the 1st day of November, 2024.

Signed By:

**_Robert E. Wier_**

**United States District Judge**